### BLACKSHERE v. PATTERSON et al.

(Circuit Court of Appeals, Fourth Circuit. February 13, 1896.)

#### No. 161.

CONTRACTS—CONSTRUCTION AND EFFECT—OCEAN FREIGHTS.

In April, 1894, a cattle shipper contracted with the agents of a steamship line to ship cattle from Baltimore to Liverpool, during the four months beginning with the 1st of September following. The rate of freight per head was to be "the average rate of freight received by the Boston-Liverpool steamers, month by month, during the existence of this contract." During the four months of the contract there were but two lines of steamers carrying cattle from Boston to Liverpool, and the only cattle carried by them were taken under contracts previously made, with two shippers, who paid, respectively, 46 and 50 shillings per head. Before the 1st of September, however, rates for cattle from other ports had very materially declined, and the shipper claimed that he was only bound to pay the average rate from such ports during the four months of the contract. *Held* that, as the terms of the contract were entirely clear, the shipper was bound to pay the average rate from Boston, namely, 48 shillings per head, notwithstanding the fact that such rate was fixed in advance by the contracts mentioned.

Appeal from the District Court of the United States for the District of Maryland.

This was a libel by George F. Patterson and Robert Ramsey against Elias A. Blackshere to recover freight alleged to be due upon certain shipments of cattle. The district court rendered a decree in favor of libelants, and the respondent appeals.

The libelants, appellees here, are the agents of the Johnston Line of steamships between Baltimore and Liverpool, England. The respondent, appellant here, is a large shipper of cattle from this country to Europe. In April, 1894, the appellant made a contract with the appellees to ship cattle by their

line of steamers from the port of Baltimore to Liverpool. Shipments were to be made during the four months from September 1, 1894, to December 31, 1894. The shipper was not willing to agree in advance on a fixed rate of freight, but evidently desired to take advantage of any fluctuation in the freight market. The libelants were willing to meet him in this regard. There are several ports in the United States from which cattle are shipped to Europe. Baltimore, Newport News, New York, and Boston enjoy the largest part of this business. Of these ports, Boston has an advantage over the others named, in that it is two or more days nearer to English ports than they are. Instead, therefore, of adopting as a standard of freight charge the rates of these other ports, or any of them, or the average rates from all the other American ports, the parties agreed to take the Boston rates as their measure of charge. The contract is in these words:

"The freight is payable upon said cattle at the average rate of freight received by the Boston-Liverpool steamers, month by month, during the existence of this contract, British sterling per head on the number shipped at Baltimore, whether delivered alive, or not delivered at all, and is payable at Baltimore."

There were two lines out of Boston to Liverpool engaged in the transportation of cattle, one known as the "Warren Line," and the other known as the "Leyland Line." These were the only lines carrying cattle, and the steamships of these lines were the only steamers which carried cattle between Boston and Liverpool during the four months specified in this contract. The Leyland Line had a contract with Swift & Co., large dealers in cattle and dressed meats, made in August, 1894, whereby the whole space room in their steamships in each succeeding voyage during each month was let at the rate of 46 shillings per head for each one of these months. The Warren Line had two contracts, one with Swift & Co., dated 31st July, 1894, the other with Hathaway & Co., dated the 23d of August, 1894, whereby the whole space in each of their steamships for the respective voyages during each of the four months from September to December was let at 50 shillings per head for each of these months. These rates were all fixed in advance. These steamships each received the freight at these rates. In the month of August the demand for freight room for cattle, which before that time had been very great and urgent, ceased, and, as the expression is, "freights broke." The rates at other American ports fell. There were no other rates at Boston than those stated above. Libelants carried the cattle for respondent, and presented a claim against him for 48 shillings per head upon cattle carried by them under the contract above set forth. Forty-eight shillings is the average between 50 shillings, received by the Warren Line, and 46 shillings, received by the Leyland Line. Respondent refused to pay this rate. The libel was then filed, the answer put in, and testimony taken. The fourth paragraph of the libel alleges that, during the months of September, October, and November, the average rates received by the Boston-Liverpool steamers, month by month, was 48 shillings British sterling per head for cattle. The answer to the fourth paragraph categorically denies it, and avers that the average rate of freight received during these months by the Boston-Liverpool steamers, month by month, was between 25 and 30 shillings British sterling per head of cattle. The district court decided in favor of the libelants, whereupon an appeal was allowed and taken to this court.

F. C. Slingluff, for appellant.

Arthur George Brown and Frederick W. Brune, for appellees.

Before SIMONTON, Circuit Judge, and HUGHES and PAUL, District Judges.

SIMONTON, Circuit Judge (after stating the facts). The parties to this contract were men of experience and ability. Each knew precisely what he wanted. The language of the contract is carefully chosen and clearly expressed. The shipper wanted to take advantage of any fluctuation of freights in his favor. The agents

of the shipping line were not afraid to take the risk. The shipper would not agree to the rates fixed so long in advance, and he therefore adopted the standard by which it could be fixed in the future. He did not select as this standard freight rates which might be prevailing at neighboring ports, nor the average freight rates from all, or any, or two or more, American ports. No doubt he saw the advantage Boston would enjoy if the competition for freight should become eager and fierce, and he selected Boston rates as his standard. Nor did he content himself with the rates charged or to be charged. Carefully avoiding the result of rebates and concessions, he adopted as his standard the average rate of freight received—that is, actually received—by the Boston-Liverpool steamers. So the shipping agents agreed to carry his cattle during the last four months of 1894, and were content to receive therefor the average rate of freight received by the Boston-Liverpool steamers, month by month, during the existence of the contract. The Baltimore Line did carry the cattle. The testimony establishes that the Boston-Liverpool steamers did carry cattle during these same months; that only two lines, and only the steamships of these lines, carried cattle between Boston and Liverpool during these months; that one of these lines received, month by month, for such carriage, 46 shillings per head as freight, and that the other line received, month by month, for such carriage, 50 shillings per head, the average being 48 shillings per head. The claim of the libelants is in the very words of the contract. The appellant contends that these rates so received by the Boston-Liverpool steamers were fixed in advance for the whole time, and that he meant rates fixed month by month, in accordance with the law of supply and demand. The contract does not say so. Indeed, how could the contract limit itself to rates fixed just before or during the performance of the contract? Cattle are not like a bill of goods in a warehouse near a wharf. It takes time to transport cattle to a port and prepare them for shipment. Freight engagements for cattle in quantities must be made in advance,— can scarcely be made at the beginning of or during the month of actual shipment. At any rate, this contract is absolutely silent as to the date when the rates were to be fixed. It confines itself to the rate of freight which was received. The appellant seeks to confine the libelants to rates of freight prevailing or received at other American ports, and to ignore the rates received at Boston by Boston-Liverpool steamers. But, when the contract was made, he selected the rates of freight received by the Boston-Liverpool steamers,—not rates prevailing, nor rates charged, but rates received,—in preference to freight rates at any one or some or all of the other American ports. If the demand for freight room had continued and increased, and if at all other American ports it had risen to 75 or 100 shillings per head, but the Boston-Liverpool steamers, bound by their contract, could not take advantage of it, could we compel the shipper here, in spite of his contract, to ignore the lower Boston-Liverpool rates, and to pay the higher rate, because it prevailed at other ports? "Non hæc in fœdera

venit." So the appellant is bound by the terms of his contract, however unexpected to him may be its result.

The decree of the district court is affirmed, with costs.